STEEB & Co. (INC.) *v.* UNITED STATES (No. 2986)[1]

United States Court of Customs Appeals, November 14, 1927

*Curie, Lane & Wallace (William Young* of counsel) for appellant.

*Charles D. Lawrence,* Assistant Attorney General *(Hugo P. Geisler,* special attorney, of counsel), for the United States.

[Oral argument October 4, 1927, by Mr. Lane and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court denying appellant's petition for remission of additional duties assessed pursuant to the provisions of section 489 of the Tariff Act of 1922. The pertinent part of section 489 provides as follows:

SEC. 489. ADDITIONAL DUTIES.—If the final appraised value of any article of imported merchandise which is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the entered value, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total final appraised value thereof for each 1 per centum that such final appraised value exceeds the value declared in the entry. Such additional duty shall apply only to the particular article or articles in each invoice that are so advanced in value upon final appraisement and shall not be imposed upon any article upon which the amount of duty imposed by law on account of the final appraised value does not exceed the amount of duty that would be imposed if the final appraised value did not exceed the entered value, and shall be limited to 75 per centum of the final appraised value of such article or articles. Such additional duties shall not be construed to be penal and shall not be remitted nor payment thereof in any way avoided, except in the case of a manifest clerical error, upon the order of the Secretary of the Treasury, or in any case upon the finding of the Board of General Appraisers, upon a petition filed and supported by satisfactory evidence under such rules as the board may prescribe, that the entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.

[1] T. D. 42475.

On the trial below appellant submitted the testimony of B. A. McKenzie, manager of its Tacoma office. The witness said in substance that he had known the importer, Mr. Yamamoto, and had acted as his customhouse broker for many years; and that, due to their long acquaintance, the importer had called to see the witness in the late spring or early summer of 1924 regarding the entry of a consignment of imported canned fish known as "kamaboko." With reference to this conversation the witness said:

A. When the first consignment arrived, Mr. Yamamoto brought the documents to me and he asked for me personally, because he had known me so long, and I talked to him regarding the question of value of kamaboko, for the reason that Japanese provisions do vary considerably. We always try to make it a specific point to check up the value before we go ahead and make up the entry. I talked with him at some length with regard to making up his invoices, and he had told me that while in Japan he had gone into the question of what the proper market value of that merchandise would be, and that the invoices compared with his investigation as to what that value would be, which was 16 yen per case.

Q. Speaking now of the shipments earlier than the present, how were they entered, and how where they appraised?—A. I should, in order to make the proper answer, I should continue that other answer to this extent: After talking with Mr. Yamamoto, Mr. Geiger, who has charge of the entry department——

Q. The entry department for your firm?—A. For our firm. Was asked to check it up with the appraiser's office to see if they had anything on that.

Q. He was acting under your direction?—A. Under my instructions. The entry was made at the invoiced values.

Q. That is, through Mr. Geiger, you were able to get no information as to any different price?—A. That is, except from what Mr. Yamamoto could give us. Then we prepared the entry based on the invoiced unit values of the first entry. It was appraised at the invoice value and so finally liquidated based on that value.

Q. Was that true in both of the prior shipments?—A. That was true in both of the prior shipments.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Well, what did he tell you was the basis of fixing of these invoice prices?—A. Mr. Yamamoto had with him a memorandum giving the value of various items that went in to make up a total, if I recall, as being around 12 yen a case.

Q. A manufacturing cost, that was?—A. A manufacturing cost, to which he added approximately 25 per cent to bring it up to 16 yen per case.

Q. Well, he didn't make out the invoice himself, did he?—A. No, sir.

Q. What did he tell you as to who made it out?—A. Well, the consular invoice that was used was made out in Kobe. Without referring to the papers, I can't recall, but the arrangements were made by he, by Mr. Yamamoto, or by his brother, who was the actual shipper in this instance.

Q. Did he tell you that his brother was also a manufacturer?—A. His brother was in charge of the factory in which this merchandise was made.

Q. Mr. Yamamoto himself being the owner of the factory?—A. Mr. Yamamoto himself being the owner of the factory, which he received as a heritage from his father.

Q. So that this was a consignment?—A. Something like a consignment. One point I should make, in particular, is the fact that in exhibiting to me memoranda which he has of these costs he thought he had added a little more profit than he should in order to make it a little bit better than the market value.

Q. Did he tell you whether or not this variety of fish was similar to the other varieties on the market?—A. He mentioned the fact that there were other brands of kamaboko that were better known in the trade, commanded a higher price, and he felt were better qualities than his kamaboko.

Q. Well, why didn't you investigate the market price on the other brands and make the entry according to those?—A. Because of his statement that his brand wouldn't be as high a value as their brands.

Q. Did you know of any other brand, of any other brand similar to the quality of his, upon which you could have based the entry?—A. We did not.

Q. Did you believe there was any?—A. I did not, from his statement.

It will be noted that the witness had reference in the quoted testimony to two consignments of "*kamaboko*" entered several months prior to the entry of the "*kamaboko*" under consideration in this case. With reference to the entry of the involved merchandise, the witness said:

Q. Now, what information did you have at the time of making the present entry *that was different from what you had before?*—A. We had no different information.

Q. Did you have any way of making any investigation as to whether or not there had been a change in the *market price?*—A. Simply through the questions asked Mr. Yamamoto, and, according to his understanding, the *market* remained the same. (Italics not quoted.)

After stating that he was not positive that the customs officials had been consulted as to market values at the time of the entry of the involved merchandise, the witness said on cross-examination:

Q. How long a time elapsed between the first entries of merchandise of similar character and the third one?—A. Several months.

Q. How many months?—A. This was in November, and the others were in the late spring or early summer.

Q. Well, did you base the entered values which you made up on the former shipments that you have spoken of?—A. Naturally, we had the former shipments in mind, inasmuch *as we did specifically make an investigation then,* and we found nothing to the contrary then, and those values were accepted by the appraiser and the collector as being correct.

Q. Well, the value which you accepted as to the other two entries you made?—A. They were.

Q. Did you say that the value of this merchandise changed somewhat freely, or the cost, or what did you say?—A. I didn't say as to any change in the value. I can say, however, that this particular commodity was one that we were not particularly familiar with, because to us it was an unusual commodity. (Italics not quoted.)

The witness further said the importer had told him that the value stated in the invoice was the correct market value of the merchandise.

The importer, Kay Yamamoto, called as a witness, corroborated the testimony of the witness McKenzie as to the conversations had by them relating to the value of the merchandise. In addition to stating that he was the owner, and his brother the manager, of the factory in Japan where the fish was produced, that he had visited

the factory in 1920 and again in 1923, and had then investigated and found that the cost of producing the merchandise at the factory was 12.50 *yen*, and that, "Somebody told my brother the price must be raised up a little when the things are exported, you know, so he added 25 per cent on it," the witness said:

Q. Then, am I correct in saying that you found a cost of between 12 and 13 yen, and that you added to that to make 16 yen, including the profit and everything?—A. Yes, sir.

Q. At the time this entry was made, did you believe that was the proper market value?—A. Yes, sir.

Q. Are there other kinds of kamaboko on the market besides yours?—A. Yes, sir.

Q. What is your brand called?—A. Star brand.

Q. How do these other brands compare with your brand in quality and in reputation?—A. There are so many brands—more than 100 kinds of brands— *and some are better than this.*

Q. Do the different brands have different prices?—A. I think so.

Q. Did you know of any way to find the exact value of your brand by comparing it with other brands?—A. No; *I don't know much about the other brands.*

Q. Did you know of any way of getting at the market value of your brand except to take the cost of manufacture and add the profit?—A. I am importing my goods directly from my factory, *so it would cost less than the other importers.*

\*       \*       \*       \*       \*       \*       \*

Q. It would cost less?—A. Yes, because the other importers are getting things through so many wholesalers and not from the factory. (Italics not quoted.)

\*       \*       \*       \*       \*       \*       \*

Upon this record the court below denied the petition, and judgment was entered accordingly.

It appears from the record that there was no attempt made by either the broker or the importer to ascertain the dutiable value of the merchandise. The broker was wholly unfamiliar with its value. He so states. He understood the importer to say that "there were other brands of *kamaboko* that were better known in the trade, commanded a higher price, and he felt were better qualities than his *kamaboko*." The importer, however, testified that, "There are so many brands—more than 100 kinds of brands—and *some* are *better* han this." (Italics not quoted.) Either the importer failed to state he situation correctly in his testimony or the broker misunderstood the importer at the time of their conversation. But, however that may be, there is nothing in the importer's testimony to indicate that there were not many other products similar to that imported by him. It is apparent that he made no investigation to ascertain whether there were such other products, because he said he knew but little about other brands. But, even assuming that there was no other similar merchandise, there is nothing in this record to show that the importer's product was not bought and sold in the markets of

Japan. On the contrary, the fact that there were other brands of *kamaboko* "better known in the trade," which "commanded a higher price" would seem to establish that the involved merchandise was bought and sold, and had a market value, in Japan. Why, then, should it have been entered at the cost of production plus 25 per centum? The only reason given was that somebody told the importer's brother that "the price must be raised up a little when the things are exported."

There was no investigation whatever of the market value of the involved merchandise. The importer told the broker that there was no change in the market value of the merchandise, although it is obvious that he had no information and made no effort to secure any upon the subject; and the broker, without any investigation whatever, assuming that, as the appraiser had approved the entered values in the prior importations, he would do likewise in this, entered the merchandise at its cost of production plus 25 per centum. It would have been remarkable had the value thus found and stated in the entry corresponded with its dutiable value.

It was incumbent upon the appellant to prove by satisfactory evidence that the entry of the merchandise at a less value than the final appraised value was without any intention to deceive the appraiser as to its value or to defraud the revenue of the United States or to conceal or misrepresent the facts.

We need not, and do not, assume that the entry of the merchandise at a less value than that returned upon final appraisement was made with an intention to conceal, misrepresent, or defraud. But, under the law, it was the duty of the appellant to prove by satisfactory evidence that such was not the case. The merchandise should have been entered at its foreign or export value, whichever was higher. These values are defined by section 402 of the Tariff Act of 1922. There is nothing in the record to indicate that the merchandise had no foreign or export value. Nevertheless, the broker, after consulting with the importer, entered it at an arbitrary figure without reference to, or recognition of, the statutory provisions pertaining thereto. Possibly this was done through ignorance. If so, it can not be offered as an explanation or excuse. The law is plain and mandatory, and must be obeyed. We have many times attempted to point out what facts must be established and the character of proof required in remission cases. Reference may be had to the following cases: *Hauptman* v. *United States*, 13 Ct. Cust. Appls. 295, T. D. 41218; *Finsilver, Still & Moss* v. *United States*, 13 Ct. Cust. Appls. 332, T. D. 41250; *Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453; *Massce & Co. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 601, T. D. 41456. It is sufficient to say in conclusion that

the appellant has wholly failed to establish its case within the rules and principles announced in those cases.

The judgment is *affirmed.*

BARBER, J., takes no part.